UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 18 C 7330 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| JOHN R. OEHLER and ) | |
| SHARON C. OEHLER, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Defendants John and Sharon Oehler obtained a refund for the 2013 tax year based on deductions John Oehler's company, Broadway Electric, Inc. ("BEI"), an S corporation, took under 26 U.S.C. § 179D for designing interior lighting systems that qualified as energy efficient commercial building property ("EECBP") in Chicago Public Schools ("CPS") buildings. The government now claims that BEI, and in turn the Oehlers, cannot benefit from the § 179D deduction, so it filed this suit to recover the refund it issued the Oehlers for the 2013 tax year under 26 U.S.C. § 7405(b).[1] The parties agreed to focus discovery on four test projects: Henry Nash Elementary School ("Nash"), Northwest Middle School ("Northwest"), Emil G. Hirsch Metropolitan High School ("Hirsch"), and Bowen High School ("Bowen", and collectively the "Selected Projects"). After completing this discovery, the parties both moved for partial summary judgment with respect to BEI's entitlement to the § 179D deduction for the Selected Projects.[2] Because the Court concludes that the undisputed facts demonstrate that BEI does not

---

[1] The government also initially challenged a credit BEI took under 26 U.S.C. § 41, but the parties have resolved that issue and so the Court does not address it further in this opinion.

[2] The Oehlers only moved for summary judgment with respect to three of the four Selected Projects, omitting Nash. The government moved with respect to all four.

qualify as a designer of the EECBP installed at the Selected Projects, meaning that BEI improperly took the § 179D deduction for these projects, the Court grants the government's motion and denies the Oehlers' motion.

## BACKGROUND[3]

### I. BEI's and the Oehlers' Tax Filings

John Oehler and George Kranzel founded BEI, a Chicago-based electrical contracting company, in 1984. For the 2013 tax year, John Oehler owned 100% of BEI.

In March 2014, BEI filed its 2013 tax return using Form 1120-S, the form for S corporations. A month later, the Oehlers filed their 2013 tax return using Form 1040. In August 2016, BEI filed an amended 2013 Form 1120-S, claiming credits for increasing research activities under 26 U.S.C. § 41 and energy efficient commercial building deductions under 26 U.S.C. § 179D.[4] BEI claimed the § 179D deductions for the work it performed upgrading lighting fixtures at 28 CPS schools (the "CPS Lighting Projects"), including the Selected Projects. Specifically, BEI claimed a $16,484 deduction for Nash, a $72,712 deduction for Northwest, a $151,685 deduction for Hirsch, and a $138,399 deduction for Bowen.

In September 2016, the Oehlers filed an amended Form 1040 for 2013, claiming a $459,102 refund attributed to the flowthrough of the adjustable taxable income and tax credits that BEI reported on its amended 2013 Form 1120-S. In November 2016, the IRS issued the Oehlers the refund they claimed on their amended 2013 Form 1040.

---

[3] The Court derives the facts set forth in this section from the statements of fact and responses submitted by the parties to the extent they comport with Local Rule 56.1. The Court has considered the parties' objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motions for summary judgment.

[4] BEI again amended its 2013 return in November 2016.

## II.     The CPS Lighting Projects

In the summer or fall of 2012, CPS decided to improve the energy efficiency of the lighting at several schools, including the Selected Projects. Later that year or in early 2013, CPS hired BEI as the lead electrical contractor for the Selected Projects. CPS and BEI had previously entered into a contracting services agreement for "regular and routine operations and maintenance repairs and work" effective January 1, 2012. Doc. 133-2 ¶ 57. In that agreement, BEI agreed to "[r]epair and install light fixtures and ballasts." *Id.* ¶ 58. CPS based its agreements with BEI for the Selected Projects off the contracting services agreement.

The CPS Lighting Projects involved converting existing T12 fluorescent lighting fixtures to T8 fluorescent fixtures, more specifically, changing the ballasts in the fixtures from lower-efficiency to higher-efficiency units. CPS hired architects to prepare plans and a scope of work for each Selected Project. The architect of record ("AOR") for each Selected Project received historical building plans and record drawings for the schools from CPS, and then the AOR created floorplans and lighting tables or schedules identifying the lighting fixtures that required retrofitting or replacement (the "original specifications").[5] The lighting tables in the original specifications included information about the space and the fixture, such as the fixture height, mounting type, number of switches, lenses, and lamps, and the fixture's wattage. They also identified the retrofit kits or fixtures to install in each space. KJWW Engineering ("KJWW") provided BEI with the original specifications for Nash and Northwest. General Energy Corp. ("General Energy") provided the Hirsch original specifications to BEI. Melvin Cohen & Associates ("Melvin Cohen") provided BEI with the Bowen original specifications.

---

[5] Retrofitting involved keeping the frames of the lighting fixtures but replacing the sockets, ballasts, lamps, and lenses, and redoing the wiring. Replacement involved disconnecting the existing fixtures, taking out the fixture assemblies, placing new complete fixtures in their place, and connecting the new fixtures.

3

BEI also received project manuals for the Selected Projects, which the AORs, and not BEI created based on a preexisting CPS template. The project manuals specified that the AOR "control[led] the placement of wall and ceiling mounted electrical devices, fixtures, and outlets." *Id.* ¶ 53 (alteration in original). They also identified the specific manufacturers from whom BEI could purchase needed supplies, general requirements for each fixture and component, and installation instructions. Further, the project manuals required BEI to verify the existing lighting fixture system and "[b]ring non-standard modifications necessary to comply with the Contract Documents and construction conflicts to the Architect's attention before proceeding with the Work." *Id.* ¶ 51. They instructed BEI to address any conflicting design information or unclear design intentions with the AOR for "further description or illustration" or "a final decision" before ordering equipment and materials and executing the work. *Id.* ¶ 52.

In accordance with the project manuals' instructions, BEI and the AORs performed site surveys at the Selected Projects, during which they walked through the buildings to compare the light fixtures needing retrofitting or replacement as shown in the original specifications with the actual light fixtures in each room. In cases of conflict, BEI submitted requests for information to the AORs for approval of alternatives or modifications to the initial scope of work. The AORs then reviewed the proposals to determine whether they conformed to the AORs' plans. Upon receiving direction from the AORs, BEI presented CPS with proposed change orders for the additional light fixtures, quoting prices for parts and labor for the installation. CPS reviewed and approved the proposed change orders, with the change orders becoming part of the contract documents for BEI's work on the Selected Projects.

BEI bought lighting fixtures and components, as well as occupancy sensors, for the Selected Projects from Evergreen Supply Company ("Evergreen"). BEI sent Evergreen a list of

the fixtures needed under the original specifications, as well as the list of acceptable manufacturers that CPS and the AOR had provided. Evergreen then determined the products that BEI needed to order, with BEI's purchase department making sure it obtained the right fixtures at the best price and with the shortest lead time. For new lighting fixtures that BEI installed as replacements, BEI received lenses with the fixtures. For existing lighting fixtures that received retrofits and needed lenses, BEI purchased them from fixture manufacturers or obtained custom lenses from Sunrise Electric Supply, which in turn purchased them from Louvers International, Inc. ("Louvers"). When possible, BEI removed lenses and sent them to Louvers to create replacement lenses. Where a sample lens was not available, BEI hand drew the lens with measurements, with Louvers using the drawing to create a prototype lens. BEI provided CPS with interior lighting submittals for each Selected Project, which showed the lighting fixtures and components it purchased. Much of the information in these submittals came from Evergreen and the manufacturers of the lighting fixtures.

      The CPS project manager for the Selected Projects, Craig Bruska, described BEI's job as "to pull and replace, according to the plans and scopes of work the architects had created." *Id.* ¶ 84. Bruska acknowledged that BEI surveyed each school and submitted requests for information to propose alternatives or modifications to the lighting scope of work. Patrick McKevitt, BEI's project manager for the Selected Projects, described BEI's work generally as "replac[ing] and install[ing] new light fixtures, lamps, ballasts, and lenses." *Id.* ¶ 85. BEI did not send invoices to CPS using the term "design," *id.* ¶ 60, and its construction schedules did not include any element or phase identified as "design," *id.* ¶ 61.

      After BEI completed its work on the Selected Projects, the original specifications were updated to reflect the additional fixtures BEI installed (the "as-built specifications"). For Nash,

5

the original specifications listed 81 fixtures that needed retrofitting or replacement and 5 replacement lenses. BEI completed this work without adding any fixtures or lenses. But BEI did purchase 11 type R8 retrofit kits in place of 11 R4 retrofit kits for the school's kitchen from Evergreen. It did so based on KJWW's direction to change the kit type for these 11 fixtures. BEI did not create any drawings of lenses for Nash.

For Hirsch, the original specifications listed 2,022 fixtures that needed retrofitting or replacement and 1,818 replacement lenses. After a site survey, BEI submitted a request for information to General Energy identifying "numerous locations that still had T12 type lamps that were not included in this schools [sic] scope of work" and asking whether to add those fixtures to the scope of work. *Id.* ¶ 98. After receiving direction from General Energy to add 105 of the newly identified fixtures to the work, BEI received approval from CPS and installed these fixtures at an additional cost of $15,582. BEI provided Louvers with 13 physical sample lenses and 3 pictures of sample lenses. BEI issued its general electrical certificate of warranty for its work at Hirsch on April 11, 2013. CPS issued its certificate of preliminary acceptance of BEI's work at Hirsch on April 16, 2013. In May 2013, BEI proposed a change order to CPS to add an additional 497 fixtures identified during an April 2013 site survey.[6] Although the record does not include a document accepting this proposed change order and the as-built specifications for Hirsch do not include the items listed in the proposed change order, CPS did pay BEI $68,323 in October 2013, which equals the cost reflected in the proposed change order.

For Bowen, the original specifications listed 2,476 fixtures that needed retrofitting or replacement and 149 replacement lenses. BEI installed an additional 92 fixtures and 11 replacement lenses. On April 24, 2013, BEI issued a proposed change order for these additional

---

[6] The parties disagree as to whether General Electric or BEI conducted the site survey, although the evidence of record suggests that both took part, with General Electric subsequently compiling the additional fixtures to add to the work.

6

items that CIC Energy Consulting, LLC had identified in a spreadsheet based on an April 3, 2013 site visit. CPS approved the proposed change order, adding $12,757 to the contract amount. The additional lenses that BEI installed correspond to a request for information that BEI submitted to the AOR identifying locations with additional lenses needing replacement. BEI provided Louvers with 7 physical sample lenses, 1 picture of a sample lens, and 1 drawing of a lens for Bowen. BEI issued its general electrical certificate of warranty for its work at Bowen to CPS on April 3, 2013. CPS issued its certificate of preliminary acceptance of BEI's work at Bowen on May 13, 2013.

For Northwest, the original specifications listed 1,457 fixtures that needed retrofitting or replacement and 51 replacement lenses. BEI installed an additional 66 fixtures and 8 replacement lenses, which it added after discovering conditions on site that the original specifications did not reflect and receiving authorization to purchase them. The additional work added $12,231 to the contract. Because construction conflicts prevented BEI from installing 59 replacement fixtures in their same locations, BEI submitted requests for information to KJWW that proposed modifications for these fixtures' installation. BEI provided Louvers with 7 physical sample lenses for Northwest. BEI issued its general electrical certificate of warranty for its work at Northwest to CPS on April 15, 2013. CPS issued its certificate of preliminary acceptance of BEI's work at Northwest on May 10, 2013.

**III.    The Section 179D Deduction Certification Process**

BEI engaged alliantgroup, LP to assist in analyzing, substantiating, and documenting BEI's energy efficient commercial property deduction properties for the 2013 tax year, including the Selected Projects. In 2016, alliantgroup prepared a 2013 179D tax deduction study (the "179D Study"). The 179D Study indicated that a licensed professional engineer certified the

energy efficient features installed at each Selected Project after conducting a field inspection in accordance with energy savings modeling and inspection guidelines prescribed by the National Renewable Energy Laboratory ("NREL") in effect at the time of certification. As relevant, these guidelines provided:

> 1. Complete the mandatory provision checklist on the Standard 90.1-2001 lighting compliance form or equivalent form to ensure that the taxpayer's building meets or exceeds the Standard 90.1-2001 mandatory provisions according to the requirements in Section 4.1 in Standard 90.1-2001.
>
> 2. Complete all the connected lighting power tables on the Standard 90.1-2001 lighting compliance form or equivalent form and ensure that the total lighting power is less than or equal to the lighting power in the Proposed Building model.
>
> 3. Record the IESNA recommended minimum and the measured illuminance for each space in Table LF1 or equivalent table for the Taxpayer's Building. Record the average measurements taken on the working surfaces or at the locations listed by the IESNA handbook. The average shall equal or exceed the IESNA recommended minimum illuminance levels. In addition, no more than 2.5% of the measurements should be below 1/3 of the IESNA recommended minimum illuminance levels. This latter requirement follows a normal distribution assuming that two standard deviations equals 1/3 of the IESNA recommended illuminance level. Measurements only need to be completed once for each unique space and lighting arrangement.
>
> 4. Verify that the lighting controls match the performance of the controls specified in the Proposed Building energy model in Table LF2 or equivalent documentation. If the controls in the taxpayer's building are different than in the Proposed Building model, the Proposed Building should be changed to match the taxpayer's building and resimulated to ensure the correct energy and power cost savings are achieved.

*Id.* ¶ 119. Adam Brian Goldberg certified that Nash and Bowen's lighting systems met § 179D's energy efficiency requirements. Jesse Aaron Stanley did the same for Hirsch, and Charles Chen did so for Northwest.

The alliantgroup field inspection reports for the Selected Projects do not include a checklist for the mandatory provisions of Standard 90.1-2001, however. Goldberg, who performed the inspections for Nash, Bowen, and Northwest, confirmed that he did not use a checklist during his inspections and instead examined the spaces to which he had access through visual observation, looking to see if he found anything unusual that clearly violated the provisions. Nick Worley, who conducted the field inspection for Hirsch, also did not include a checklist in his inspection notes for the mandatory provisions of Standard 90.1-2001.

The field inspection reports also do not include a place to record the IESNA recommended minimum illuminance, and Goldberg indicated he typically would not have recorded this value as part of his field inspections. But Goldberg recorded the illuminance of each space he inspected and documented whether lighting controls were found in each of the spaces. He did not take light measurements in three rooms at Northwest where the fixtures were not directly mounted on the ceilings. Worley took photographs of the illuminance readings in at least some of the rooms he inspected at Hirsch.

The field inspection reports do not contain a place to verify that the lighting controls matched the performance of the lighting controls in alliantgroup's computer models for calculating the § 179D deduction. The reports did note where the inspector observed occupancy sensors and bi-level switches, which the report identified as energy efficient features of the Selected Projects. The lighting controls column in the original and as-built specifications for all the Selected Projects did not identify any bi-level switching lighting controls, however. The Northwest, Hirsch, and Bowen specifications identified some occupancy sensors, while the Nash specifications identified none. BEI did not purchase any occupancy sensors for Nash or Northwest.

9

In addition to the certificates of compliance from the alliantgroup inspectors, BEI obtained a Section 179D allocation from CPS for the Selected Projects, memorialized in a single allocation document that BEI created. The allocation document identified Christopher Williams, the assistant director of facilities management for CPS, as the owner representative.[7] Williams did not work for CPS in 2013, but he consulted with CPS' external engineering consultant, Jacobs Engineering Group, Inc. to determine the accuracy of the representations made in the allocation document. The document indicated that CPS allocated 100% of the Section 179D deduction for the Selected Projects to BEI. Paul Mazzocco, BEI's chief financial officer, signed the allocation document on April 15, 2015, and Williams followed with his signature on September 14, 2015.

The allocation document indicates that the EECBP installed at Northwest, a 121,186 square foot building, cost $255,604. The allocation document states that the EECBP installed at Hirsch, a 252,809 square foot property, cost $349,358. The allocation document indicates that the EECBP installed at Bowen, a 230,665 square foot building, cost $239,984. Finally, the allocation document states that the EECBP installed at Nash, a 100,209 square foot building, cost $16,484. According to the allocation document, the EECBP for all four of the Selected Projects was placed into service in August 2013.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the

---

[7] The Board of Education of the City of Chicago's rules provide that the Board "reserves to itself all authority and power it has not specifically delegated to another by Board Rule, Board Policy, Board Report, or other Board action." Doc. 132-2 ¶ 52. While the parties have not identified any specific rule or action providing Williams with the authority to allocate tax deductions, Williams stated that he did indeed have such authority.

pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Therefore, when considering the government's motion for summary judgment, the Court views all evidence in the light most favorable to the Oehlers, and when considering the Oehlers' motion for summary judgment, the Court views all evidence in the light most favorable to the government. *Id.*

## ANALYSIS

To recover the refund issued to the Oehlers under 26 U.S.C. § 7405(b), the government must show (1) that it issued a refund to the Oehlers, (2) the amount of the refund, (3) the timeliness of the action, and (4) that the Oehlers were not entitled to the refund. *United States v. Com. Nat'l Bank of Peoria*, 874 F.2d 1165, 1169 (7th Cir. 1989). The government bears the burden of proof. *Id.* Only the fourth element, whether the Oehlers were entitled to the refund they received as a result of BEI's § 179D deductions, is at issue here.

Section 179D allows a taxpayer to deduct "the cost of energy efficient commercial building property placed in service during the taxable year." 26 U.S.C. § 179D(a).[8] Section 179D further defines EECBP as property

> (A) with respect to which depreciation (or amortization in lieu of depreciation) is allowable,
>
> (B) which is installed on or in any building which is--
>
>> (i) located in the United States, and
>>
>> (ii) within the scope of Standard 90.1-2001,
>
> (C) which is installed as part of--
>
>> (i) the interior lighting systems,
>>
>> (ii) the heating, cooling, ventilation, and hot water systems, or
>>
>> (iii) the building envelope, and
>
> (D) which is certified in accordance with subsection (d)(6) as being installed as part of a plan designed to reduce the total annual energy and power costs with respect to the interior lighting systems, heating, cooling, ventilation, and hot water systems of the building by 50 percent or more in comparison to a reference

---

[8] The Court refers to the version of § 179D that was effective in 2013, the tax year at issue.

>building which meets the minimum requirements of Standard 90.1-
2001[9] using methods of calculation under subsection (d)(2).

26 U.S.C. § 179D(c)(1). If the EECBP does not meet the 50% requirement, a taxpayer may take a partial deduction if the EECBP reduced the total energy cost of the building by a certain percentage, which the IRS has established as 20% for lighting systems. 26 U.S.C. § 179D(d)(1)(A); IRS Notice 2008-40 § 7.01; IRS Notice 2006-52 § 2.03(a). Because government entities like CPS do not benefit from tax deductions, § 179D provides that the government entity may allocate "the deduction to the person primarily responsible for designing the property in lieu of the owner of such property." 26 U.S.C. § 179D(d)(4).

The government argues that the Oehlers, through BEI, cannot take advantage of the § 179D deductions for the Selected Projects because (1) BEI did not design the lighting systems and (2) BEI did not obtain a valid certification for any of the Selected Projects. The Oehlers, on the other hand, argue that the undisputed facts demonstrate BEI's entitlement to the § 179D deductions for three of the four Selected Projects: Bowen, Hirsch, and Northwest. The Court need only address whether BEI qualifies as a "designer" of the Selected Projects to resolve the parties' motions.

In IRS Notice 2008-40, the IRS provided the following guidance on who qualifies as a designer for purposes of the § 179D deduction:

>A designer is a person that creates the technical specifications for installation of energy efficient commercial building property (or partially qualifying commercial building property for which a deduction is allowed under § 179D). A designer may include, for example, an architect, engineer, contractor, environmental consultant or energy services provider who creates the technical specifications for a new building or an addition to an existing building that incorporates energy efficient commercial building

---

[9] Standard 90.1-2001 refers to Standard 90.1-2001 of the American Society of Heating, Refrigeration, and Air Conditioning Engineers and the Illuminating Engineering Society of North America in effect on April 2, 2003. 26 U.S.C. § 179D(c)(2).

>property (or partially qualifying commercial building property for which a deduction is allowed under § 179D). A person that merely installs, repairs, or maintains the property is not a designer.

IRS Notice 2008-40 § 3.02. The IRS further explained that where more than one designer exists, the government entity may "determine which designer is primarily responsible and allocate the full deduction to that designer" or alternatively "allocate the deduction among several designers." *Id.* § 3.03. The government argues that BEI does not qualify as a designer of the Selected Projects and instead merely replaced and installed the lighting fixtures pursuant to technical specifications created by the AORs. The Oehlers, on the other hand, maintain that while BEI did not develop the original specifications, at least as it pertains to Bowen, Hirsch, and Northwest, BEI created additional specifications by identifying additional fixtures that needed retrofitting or replacement.

Initially, the Court rejects the government's argument that BEI cannot obtain the § 179D deduction because even if it fell within the definition of a designer, it did not perform sufficient design work to qualify as the *primary* designer of the project. As the IRS explained in Notice 2008-40, where more than one designer exists, the government entity may "determine which designer is primarily responsible and allocate the full deduction to that designer" or alternatively "allocate the deduction among several designers." *Id.*; *see also* IRS Memo. No. AM 2018-005 at 2 (noting that a building owner has "discretion" to allocate the deduction "to the primary Designer of one system" or "among several Designers").[10] Therefore, the Court does not find BEI's admittedly limited involvement determinative.

---

[10] The IRS Memorandum states that it "may not be used or cited as precedent." IRS Memo. No. AM 2018-002; *see* 26 U.S.C. § 6110(k)(3) ("Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent."). Nonetheless, because the parties discuss this memorandum, and in the absence of additional guidance from the Secretary of the Treasury, the Court finds it instructive. *See Meredith Corp. v. United States*, 405 F. Supp. 3d 795, 804 n.3 (S.D. Iowa

Nonetheless, the Court agrees with the government that, on the Selected Projects, BEI served merely as an installer of the EECBP and so cannot take advantage of the § 179D deduction. BEI received the technical specifications for the Selected Projects from the AORs. The AORs "provided plans specifying what types of fixtures should be installed, where, and how each fixture should be wired, along with a schedule of light fixtures that would meet the plan's parameters." *United States v. Quebe*, No. 3:15-cv-294, 2019 WL 330852, at *7 (S.D. Ohio Jan. 25, 2019). Although BEI in some instances identified additional fixtures that needed replacement or issues with the original specifications, it did not have the ability to modify the specifications itself but instead had to obtain authorization from the AORs and CPS to do so. *See* Doc. 133-2 ¶ 51 (project manuals required BEI to "[b]ring non-standard modifications necessary to comply with the Contract Documents and construction conflicts to the Architect's attention before proceeding with the Work" (alteration in original)); *id.* ¶ 52 (project manuals required BEI to refer conflicting design information or any other design issues to the AORs for "further description or illustration" or a "final decision" before taking any action). Instead, as the Oehlers admit, the AORs "control[led] the placement of wall and ceiling mounted electrical devices, fixtures, and outlets." *Id.* ¶ 53 (alteration in original).

In other words, contrary to the Oehlers' argument, BEI did not create any additional specifications for the installation of energy efficient lighting at the Selected Projects. *Cf. Johnson v. Comm'r of Internal Revenue*, 160 T.C. No. 2, 2023 WL 395658, at *13 (T.C. Jan. 25, 2023) (company created technical specifications for purposes of § 179D deduction where it "modif[ied] the sequence of operations to better operate the systems and programm[ed] the modified sequence of operations into the new Johnson control systems"). Instead, BEI's role

---

Sept. 17, 2019) (finding IRS Office of Chief Counsel's memorandum "enlightening" where it addressed a similar fact pattern to the one before the court).

was limited to implementing the technical specifications created by the AORs by reviewing the specifications, consulting with the AORs as to any additional fixtures that needed replacement or retrofitting, selecting the light fixtures that met the specifications (often by outsourcing that role to Evergreen), and then installing the light fixtures in accordance with the specifications. *See* Doc. 133-2 ¶ 84 (CPS' project manager, Bruska, describing BEI's job as "to pull and replace, according to the plans and scopes of work the architects had created"); *id.* ¶ 85 (BEI's project manager, McKevitt, describing BEI's work as "replac[ing] and install[ing] new light fixtures, lamps, ballasts, and lenses"). This limited role is particularly clear with respect to Nash, where BEI did not identify any additional fixtures that needed retrofitting or replacement, and installed the fixtures in line with the original specifications that it did not design.[11] And for the other locations, to the extent BEI discovered any issues with the original specifications, BEI referred those issues to the AORs, requesting direction from them as to how to proceed.[12] BEI's role in the Selected Projects, then, did not rise to the level of a designer under § 179D. *See* IRS Notice 2008-40 § 3.02 ("A person that merely installs . . . the property is not a designer."); IRS Memo. No. AM 2018-005 at 6 (IRS Office of Chief Counsel guidance that a general contractor who

---

[11] The Oehlers note that BEI issued a change order to Evergreen to purchase type R8 retrofit kits for Nash in lieu of F4 kits for 11 fixtures. But, as the government points out, BEI did this in response to direction it received from KJWW, the Nash AOR. *See* Doc. 135-1 ¶ 192. Further, the Oehlers admitted that BEI did not create the original specifications and that BEI completed its work at Nash with no changes from the original specifications, foreclosing any potential argument that it qualifies as a designer for this project.

[12] Indeed, even some of the evidence that the Oehlers attempt to use to demonstrate that BEI created specifications indicates that other parties, and not BEI, created those specifications. For example, BEI issued Bowen proposed change order no. 41 in response to CPS-issued Bowen Bulletin 3, which included a spreadsheet that the Oehlers admit that BEI did not create that identified additional work necessary at Bowen that had not been identified in the original specifications. Even assuming that BEI accompanied CIC Energy on the site visit that resulted in the spreadsheet, CIC Energy, not BEI, created the specifications for the additional work included in Bowen proposed change order no. 41. Similarly, for Hirsch, the site survey used as the basis for proposed change order no. 56 appears to have been created by General Energy, the AOR for Hirsch, with no evidence suggesting that BEI added the additional information to the site survey document.

suggested changes to the placement of rooftop units that a design team approved did not "rise to the level of technical specifications" to qualify the general contractor as a designer); *id.* at 8–9 (subcontractor who installed HVAC system controls and provided shop drawings of the controls did not qualify as a designer of the HVAC system)[13]; *Quebe*, 2019 WL 330852, at *7–8 (company did not qualify as designer where it selected and installed fixtures based on a plan it did not create); *cf. Johnson*, 2023 WL 395658, at *13 (company's work to modify the sequence of operations to better operate the HVAC system amounted to creating technical specification for the installation of EECBP). Therefore, because BEI did not qualify for the § 179D deduction it took for the Selected Projects, the Oehlers also improperly benefitted from that deduction.

## CONCLUSION

For the foregoing reasons, the Court grants the government's motion for partial summary judgment [129] and denies the Oehlers' motion for partial summary judgment [130]. The Court finds that BEI was not entitled to a deduction under § 179D for the Selected Projects, meaning that the Oehlers received an erroneous refund for the 2013 tax year with respect to these Selected Projects.

Dated: September 23, 2024

SARA L. ELLIS
United States District Judge

---

[13] The Oehlers argue that one of the scenarios presented in the IRS memorandum supports their arguments because in that case, the Office of Chief Counsel took the position that a lighting firm hired "to design and install a unique interior lighting system" that was "built to general parameters specified by the Architect" qualified for a § 179D deduction. IRS Memo. No. AM 2018-005 at 9–10. But in that scenario, the Office of Chief Counsel assumed that the lighting firm designed the lighting system and only considered the question of whether the lighting firm could benefit from the deduction despite only designing the lighting system and not also the building envelope or HVAC system, not whether the actual work the lighting firm undertook qualified as design work. *Id.*

17